UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| CHARLOTTE KINNARD, INDIVIDUALLY AND ON BEHALF OF THE ESTATE OF MINNIE S. KINNARD, DECEASED, <br><br> Plaintiff, <br><br> v. <br><br> SSC MISSOURI CITY OPERATING COMPANY, LLC d/b/a FIRST COLONY HEALTH AND REHABILITATION CENTER, <br><br> Defendant. | CASE NO. _____ |

## PLAINTIFF'S ORIGINAL COMPLAINT

COMES NOW, Plaintiff CHARLOTTE KINNARD, INDIVIDUALLY AND ON BEHALF OF THE ESTATE OF MINNIE S. KINNARD, DECEASED, and brings this action against Defendant SSC MISSOURI CITY OPERATING COMPANY, LLC d/b/a FIRST COLONY HEALTH AND REHABILITATION CENTER seeking actual damages for medical negligence that resulted in severe injuries and the death of Minnie Kinnard.

### I.  SUMMARY OF CASE

This is a case about the inexcusable neglect of Plaintiff's mother, Minnie Kinnard, who was a long-term resident in the First Colony Health and Rehabilitation Center skilled nursing facility due to her progressing dementia.  While Ms. Kinnard was a resident in the facility, the nursing and medical staff provided minimal monitoring of her and failed to adequately report changes in her medical condition, which resulted in Ms. Kinnard becoming severely dehydrated and suffering from acute renal failure and septic shock.  In addition, even though Ms. Kinnard was a fall risk, she was not closely monitored or supervised.  On July 6, 2016, Ms. Kinnard fell

out of her wheelchair, hit her head on the floor, and suffered a traumatic brain injury. Ms. Kinnard died the next day from conditions related to her severe dehydration and traumatic brain injury.

## II.  THE PARTIES

1. Plaintiff Charlotte Kinnard is an individual who resides in Texas. Plaintiff is the surviving daughter of Minnie S. Kinnard, Decedent, and brings this lawsuit individually, as a wrongful-death action, and as a survival action as the representative of the Estate of Decedent.

2. Minnie S. Kinnard, deceased ("Decedent"), would have been entitled to bring a suit for damages had she lived.

3. Defendant SSC Missouri City Operating Company, LLC d/b/a First Colony Health and Rehabilitation Center is a Delaware limited liability company with its principal place of business located at One Ravina Drive, Suite 1500, Atlanta, Georgia 30346. During the relevant period of time, Defendant operated, managed, and/or controlled the First Colony Health and Rehabilitation Center skilled nursing facility at which Decedent was a resident, located at 4719 Lexington Blvd., Missouri City, Texas 77459 ("First Colony"). In the event that Defendant is misnamed or named incorrectly, such an event is a "misnomer." At all relevant times, Defendant is believed to have done business as First Colony Health and Rehabilitation Center as an assumed business name. Plaintiff brings this action against First Colony Health and Rehabilitation Center in its actual and assumed name. Defendant may be served with process through its registered agent, CT Corporation System, 1999 Bryan Street, Suite 900, Dallas, Texas 75201.

## III.  JURISDICTION AND VENUE

4. This Court has subject-matter jurisdiction over this cause and Plaintiff's state-law claims under 28 U.S.C. § 1332 because the amount in controversy exceeds $75,000 exclusive of

interest and costs and Plaintiff and Defendant are citizens of different states.

5. This Court has general and specific personal jurisdiction over Defendant because Defendant has established minimum contacts with the State of Texas and the Court's exercise of jurisdiction comports with traditional notions of fair play and substantial justice.

6. Under 28 U.S.C. § 1391(b), venue is proper in this Court because a substantial part of the events or omissions giving rise to Plaintiff's causes of action occurred in whole or in part in this district.

## IV.  FACTS APPLICABLE TO ALL COUNTS

7. Minnie Kinnard, deceased, was first admitted as a long-term resident in First Colony in October 2014 due to her progressing dementia. At the time of her admission, Ms. Kinnard was 77 years of age. She required assistance with most activities of her daily living, such as toileting, bathing, and dressing, and she also required assistance with eating and maintaining adequate hydration. In addition, Ms. Kinnard was wheelchair bound and unable to ambulate by herself. She required assistance with transferring between her bed and her wheelchair and with operating her wheelchair.

8. Due to her cognitive limitations, lack of mobility, inability to care for herself, and other medical conditions, Ms. Kinnard was at a high risk for falling and developing malnutrition and dehydration during her residency in First Colony.

9. In fact, during her residency Ms. Kinnard was repeatedly evaluated by the nursing and therapy staff and determined to be a high fall risk due to her cognitive limitations, poor safety awareness, lack of decision making ability, and lack of strength and balance for mobility. In addition, the nursing staff were repeatedly informed by the therapy staff that Ms. Kinnard required specific placement in her wheelchair to prevent falling out of the device.

10. Based on this, the facility's nursing staff were required to closely monitor and

supervise Ms. Kinnard and implement necessary fall prevention measures. Unfortunately, despite having actual knowledge of her increased fall risk, the medical and nursing staff failed to implement necessary fall prevention measures, fall injury protection measures, or provide close monitoring and supervision of Ms. Kinnard.

11. On May 13, 2016, Ms. Kinnard suffered her first fall in the facility. Although she did not sustain any injuries in this fall, the nursing staff had actual knowledge of her fall risk due to this incident and should have implemented fall precaution measures. Unfortunately, the nursing staff did not provide any additional monitoring or supervision of Ms. Kinnard following this incident.

12. During this same time (late April through mid-May 2016), Ms. Kinnard also began to require increased cueing and prompting with meals and drinking fluids. By late April 2016, lab testing obtained by the facility confirmed that Ms. Kinnard was dehydrated and slightly malnourished. Based on this, the nursing staff should have more closely monitored Ms. Kinnard's fluid intake, evaluated her input and output levels every shift, every day, and closely supervised her during meals and throughout the day to ensure that she received enough hydration. Unfortunately, this did not happen.

13. In mid-June 2016, additional laboratory testing confirmed that Ms. Kinnard was profoundly dehydrated – with a Blood urea nitrogen (BUN) level over two times the normal limit and abnormal Createnine and Albumin levels. Again, the nursing staff were ordered to increase fluid intake for Ms. Kinnard and obtain repeat laboratory testing in late June. Again, however, u this did not happen.

14. On July 6, 2016, Ms. Kinnard fell out of her wheelchair, face first, and hit the floor, sustaining a severe brain injury. Based on discussions with staff at the facility, at the time of her fall Ms. Kinnard was in her wheelchair and being assisted by one of the nursing aides.

This aide moved Ms. Kinnard's wheelchair without ensuring that she would not fall forward, and Ms. Kinnard fell out of her wheelchair onto her face.

15. Following the fall, Ms. Kinnard went unconscious and suffered a cardiac arrest. The nursing staff performed cardiopulmonary resuscitation (CPR) and called 911.

16. Once the ambulance arrived, Ms. Kinnard was immediately rushed to CHI St. Luke's Sugar Land Hospital, still unresponsive and in critical condition.  At St. Luke's, Ms. Kinnard was evaluated and diagnosed with septic shock, acute renal failure, hyperkalemia (high blood potassium level), severe metabolic acidosis (abnormal chemical imbalance in the blood), and acute encephalopathy (brain damage).  Ms. Kinnard's dehydration was profound – her BUN level was greater than 110, which is more than four times the uppermost normal limit, and her Creatinine level was 5.2, which is nearly five times the uppermost normal limit.

17. Due to the extent of her injuries and diminished health, Ms. Kinnard's daughter, Plaintiff Charlotte Kinnard, and her physicians decided that she would prefer to be placed on comfort care.

18. Ms. Kinnard never regained consciousness and died the next day, July 7, 2016 from complications due to her traumatic brain injury and severe dehydration. Ms. Kinnard died as a direct result of the inadequate care and treatment that she received at First Colony.

## V.  CAUSES OF ACTION

**COUNT ONE:  MEDICAL NEGLIGENCE.**

19. Plaintiff hereby incorporates and realleges the matters set forth in the preceding paragraphs as if set forth at length.

20. During the relevant period of time, Defendant managed, operated, and/or controlled the First Colony medical facility and is a health-care provider licensed by the State of Texas to provide health care.  Defendant provided health care to Decedent, and at all times

relevant there existed a physician-patient relationship between Defendant and Decedent. As such Defendant is considered health-care institution under the Texas Civil Practice & Remedies Code.

21. Defendant owed Decedent a legal duty of care to act as reasonably prudent health-care providers would act under the same or similar circumstances, including but not limited to exercising that degree of care required by Decedent's known physical and mental condition.

22. Through Defendant's agents, employees and representatives, Defendant breached the applicable standard of care while providing medical care and treatment to Decedent by engaging in numerous improper acts and omissions including but not limited to the following:

    a.    Failing to properly monitor, evaluate, and re-evaluate Decedent's known physical condition;

    b.    Failing to properly and timely observe, assess, evaluate, and/or treat Decedent with regard to Decedent's risk of falling and sustaining injuries, including but not limited to:

        (i)    failing to properly evaluate and assess Decedent's fall risk upon admission and thereafter;

        (ii)    failing to complete a proper fall risk assessment of Decedent upon admission and thereafter;

        (iii)    failing to create, implement, monitor, and oversee a proper fall risk care plan for Decedent and failing to amend, update, and/or alter care plans for Decedent to address Decedent's changing medical conditions as they related to Decedent's fall risk;

        (iv)    failing to implement and put in place appropriate measures, medical devices, plans, and procedures to prevent, guard against, and/or lessen the chance of a fall involving Decedent;

        (v)    failing to follow its own fall risk plan for Decedent; and

        (vi)    failing to have adequate and trained medical and nursing staff to closely monitor, observe, supervise, and assist Decedent with prevention of falls;

    c.    Failing to ensure that Decedent was properly hydrated and provided sufficient nutrition and food intake and failing to ensure that Decedent did not become dehydrated and/or malnourished;

    d.      Failing to create, implement, and monitor an appropriate care plan that took into consideration Decedent's known physical condition and needs;

    e.      Failing to properly train, monitor, supervise, and oversee its employees, agents, and staff to ensure that proper nutrition and hydration was provided to Decedent and that measures to prevent falls and injuries were put into place;

    f.      Failing to formulate and institute proper policies and procedures for the care and treatment of patients such as Decedent with known medical conditions, and failing to properly train its employees and agents on such proper policies and procedures;

    g.      Failing to exercise reasonable care in the selection and maintenance of its medical and nursing staff;

    h.      Failing to properly supervise its employees, agents, and staff; and

    i.      Failing to ensure that appropriate levels of staffing and training of staff were provided for the care and treatment of patients, including Decedent, and that sufficient funds were budgeted and expended on staff, training or staff, medical supplies, and medical care and treatment for Decedent.

23.    As outlined above, Defendant failed to meet the applicable standards of care that Defendant owed to Decedent, and this failure was a proximate cause of severe damages suffered by Plaintiff and Decedent.

**COUNT TWO: CORPORATE NEGLIGENCE.**

24.    Plaintiff hereby incorporates and realleges the matters set forth in the preceding paragraphs as if set forth at length.

25.    At all relevant times, Defendant owed Decedent a legal duty of care to act as a reasonably prudent health-care provider would act under the same or similar circumstances, including but not limited to exercising that degree of care required by Decedent's known physical and mental condition.

26.    Defendant was required to ensure that First Colony had sufficient trained medical and nursing staff to provide the necessary medical treatment, monitoring, and supervision of all residents, including Decedent.  Defendant had an obligation to sufficiently staff First Colony to

ensure that each of its residents received the necessary care and services for them to attain or maintain the highest practicable physical, mental, and psychosocial well-being, consistent with the resident's comprehensive assessment and plan of care. This included Decedent.

27. This obligation required Defendant to sufficiently staff First Colony based not only upon the number of residents residing in the facility but also on the medical needs of those residents.

28. In addition, Defendant was required to properly capitalize First Colony to ensure that the required medical and nurse staffing, medical treatment, monitoring, and supervision of all residents, including Decedent, was provided.

29. Through Defendant's management and operational control of First Colony, Defendant engaged in numerous acts that affected resident medical care in the facility, including, but not limited to: (i) creating, setting, funding and/or implementing budgets; (ii) monitoring resident acuity levels; (iii) setting and monitoring staffing levels of nursing and medical staff; (iv) controlling resident admissions and discharges; and (v) controlling the number of hours of direct care provided to the residents of First Colony by licensed nurses and Certified Nurses Aides (hereinafter "CNAs") employed by Defendant. Each of these managerial and operational functions had a direct impact on the quality of care delivered to Ms. Kinnard at the facility and were taken in furtherance of operational and managerial objectives.

30. In addition, based on information and belief, Defendant substantially derived its revenue and profits through its operation of this facility from the receipt of taxpayer funds through federal and state funded Medicare and Medicaid programs. The rate at which a skilled nursing facility is compensated by Medicare for the delivery of skilled nursing care and services is normally based upon the "acuity" level of the residents in the facilities. "Acuity" is a term commonly used by healthcare providers and can be defined as the measurement of the intensity

of nursing care required by a resident.  Residents with higher acuity levels place higher demands for care and services on the skilled nursing facility and its staff, and, therefore, the care provided to these residents is compensated at higher levels.

31. Acuity levels are reflected in the resident's Resource Utilization Group score ("RUG") of the resident.  RUG scores are contained in section Z of each resident's Minimum Data Set (hereinafter "MDS").  An MDS is required to be completed by every nursing home for every resident in a skilled nursing facility regardless of their payor status.

32. The Centers for Medicare and Medicaid Services (hereinafter "CMS") is the federal agency that is tasked with regulating all skilled nursing facilities in this country.  Through the years, CMS has sponsored multiple studies to determine the amount of time that skilled nursing facility staff spent caring for residents, as well as other elements of resident care.  As a consequence of these studies, CMS is able to set a number of hours of direct care that is expected to be provided to residents by licensed nurses and CNAs based on the skilled nursing facility's total acuity level.  This expectation is expressed in terms of "hours per patient day" or "HPPD".

33. Based on information and belief, Defendant engaged in a systematic process of ensuring that First Colony maintained the highest acuity levels possible while at the same time providing insufficient capitalization and staff to meet the individual needs of its residents during the time that Ms. Kinnard was a resident in this facility.   This purposeful undercapitalization and understaffing directly resulted in the failure of First Colony to provide the necessary and basic services that Ms. Kinnard needed to prevent her from sustaining the injuries pleaded herein.

34. Defendant breached its duty of care to Decedent by engaging in numerous improper acts and omissions constituting corporate negligence, including but not limited to the following:

    a.    Failing to ensure that appropriate levels of medical and nursing staff were maintained in the facility to provide necessary medical care, monitoring, and

          supervision of residents, including Decedent;

b.      Staffing the facility below what was necessary to properly care for each of the facility's residents' needs, including Decedent, based on the acuity level of all residents in the facility, including Decedent;

c.      Failing to provide sufficient training and follow-up review of medical and nursing staff to ensure that the medical and nursing staff had the necessary training to provide the required medical care, monitoring, and supervision of residents, including Decedent;

d.      Failing to ensure that sufficient funds were budgeted and expended on staff, training or staff, medical supplies, and medical care and treatment for Decedent; and

e.      Failing to properly the facility to ensure that the required medical treatment, monitoring, and supervision of all residents, including Decedent, was provided.

35.     As outlined above, Defendant failed to meet the applicable standards of care that Defendant owed to Decedent, and this failure was a proximate cause of severe damages suffered by Plaintiff and Decedent.

**COUNT THREE: NEGLIGENCE PER SE.**

36.     Plaintiff hereby incorporates and realleges the matters set forth in the preceding paragraphs as if set forth at length.

37.     The Federal Nursing Home Reform Act (42 USC 1396r) was part of the 1987 Omnibus Budget Reconciliation Act, Pub. L.100-203, 101 Stat. 1330 (1987) (hereinafter "OBRA"), which is codified at 42 C.F.R. Part 483, Subpart B – Requirements for Long Term Care Facilities.  OBRA is a federal statute that regulates skilled nursing facilities, which was in effect during the time that Decedent was a resident in First Colony.

38.     Under 42 C.F.R. §483.25(j), each facility is required to provide its residents with sufficient fluid intake to maintain proper hydration and health. While Decedent was a resident in First Colony, Decedent was not provided sufficient hydration, and as a result, Decedent became severely dehydrated, suffered renal failure, and suffered from septic shock due to her severe

dehydration.

39. In addition, under 42 C.F.R. §483.25(h), each facility must ensure that –

(1) The resident environment remains as free of accident hazards as is possible; and

(2) Each resident receives adequate supervision and assistance devices to prevent accidents.

40. While Decedent was a resident in First Colony, Decedent was not provided the necessary supervision and assistance devices to prevent Decedent from falling. In addition, the facility failed to provide Decedent with an environment that was free of accident hazards. As a result, Decedent fell in the facility and sustained severe injuries.

41. Defendant failed to meet the above requirements, and these violations, singularly or in combination with others, constituted negligence *per se*, which proximately caused severe damages suffered by Plaintiff and Decedent. Decedent was a member of the class of persons sought to be protected by these regulations.

**COUNT FOUR: VICARIOUS LIABILITY.**

42. Plaintiff hereby incorporates and realleges the matters set forth in the preceding paragraphs as if set forth at length.

43. Defendant employed, trained, supervised, and/or monitored various medical and nursing staff that provided medical care and treatment to Decedent while Decedent was a resident in the First Colony medical facility.

44. Defendant is responsible for the acts and/or omissions of its respective agents, ostensible agents, servants, employees, contractors, and representatives during the care and treatment of Decedent under various theories of vicarious liability, including but not limited to the doctrines of actual authority, apparent authority, *respondeat superior*, and ratification.

45. ***Respondeat Superior*** - At all relevant times, Defendant's agents, employees, and

representatives that rendered care and treatment to Decedent were acting within the course and scope of their employment and/or agency with Defendant, in furtherance of Defendant's business, and for the accomplishment of the object for which they were hired and/or employed. Decedent was injured as the result of medical negligence committed by Defendant's respective agents, employees, and representatives that rendered care and treatment to Decedent.

46. *Actual Authority* - At all relevant times, Defendant intentionally conferred authority on its agents, intentionally allowed its agents to believe that they had the proper authority, or, through the lack of due care, allowed its agents to believe that they had the proper authority, to act on Defendant's behalf in the care and treatment of Decedent. Decedent was injured as the result of medical negligence committed by Defendant's respective agents, employees, and representatives while acting within the scope of their agency with Defendant.

47. *Apparent Authority* – At all relevant times, Defendant affirmatively held out its respective agents, employees, and representatives that rendered care and treatment to Decedent as having authority to act on its behalf, knowingly permitted its respective agents, employees, and representatives to hold themselves out as having property authority, or acted with such a lack of ordinary care as to clothe its agents, employees, and representatives with the indicia of authority. Defendant's conduct caused Decedent to believe that Defendant's agents, employees, and representatives had the authority to act on Defendant's behalf, and Decedent justifiably relied upon Defendant's agents, employees, and representatives' authority.

48. *Ratification* – Defendant is also vicariously liable for the acts and/or omissions of its respective agents, employees, and representatives acting outside the scope of their authority because Decedent was injured by Defendant's agents or non-agents who provided medical care and treatment to Decedent, Defendant's agents and/or non-agents engaged in improper acts and/or omissions on behalf of Defendant, Defendant approved these acts and omissions by word,

act, or conduct after acquiring full knowledge of the alleged acts and/or omissions, and Defendant gave approval with the intention of giving validity to the acts and/or omissions of its agents, employees, and representatives.

## VI.  DAMAGES

49. Plaintiff hereby incorporates and realleges the matters set forth in the preceding paragraphs as if set forth at length.

50. Defendant's breach of duty proximately caused injuries to Plaintiff and Decedent, which resulted in the following damages to Plaintiff and the Estate of Decedent:

**Wrongful-Death Action Damages**

a. Mental anguish in the past and future;
b. Loss of companionship and society in the past and future;
c. Pecuniary losses;
d. Loss of household services in the past and future;
e. Loss of companionship and society;
f. Loss of inheritance; and
g. Funeral expense reimbursement.

**Survival Action Damages**

a. Pain and suffering of Decedent;
b. Mental anguish of Decedent;
c. Physical impairment of Decedent;
d. Past medical expenses incurred for Decedent's treatment; and
e. Funeral expenses incurred by Decedent's estate.

## VII.  EXEMPLARY DAMAGES

51. Plaintiff hereby incorporates and realleges the matters set forth in the preceding paragraphs as if set forth at length.

52. As outlined above, Defendant's acts and omissions constitute conscious disregard for the safety and welfare of patients, including Decedent. With actual notice of Decedent's physical condition and medical needs, Defendant failed to exercise even the basic level of proper care, failed to ensure that adequate and properly trained staff treated and monitored Decedent,

and failed to ensure that sufficient funds were allocated and expended on staffing and care of patients such as Decedent. Furthermore, based on information and belief Defendant intentionally understaffed its facility well below the requirements of the acuity level of its residents to increase its profits. In short, Defendant placed profits over patients. Defendant's conscious disregard for patients and its decision to place profits over its patients resulted in severe injuries to Decedent.

53. Because Defendant's actions were fraudulent, malicious, and/or grossly negligent, Plaintiff requests that exemplary damages be awarded against Defendant in a sum within the jurisdictional limits of the Court.

## VIII.  DEMAND FOR JURY TRIAL

54. Plaintiff demands a trial by jury and have paid the appropriate fee.

## IX. CONDITIONS PRECEDENT

55. Plaintiff has fully performed all conditions precedent to this action, including but not limited to providing Defendant with written notice of Plaintiff's claims.

## X.  REQUEST FOR RELIEF AND PRAYER

**WHEREFORE, PREMISES CONSIDERED**, Plaintiff CHARLOTTE KINNARD, INDIVIDUALLY AND ON BEHALF OF THE ESTATE OF MINNIE S. KINNARD, DECEASED, respectfully requests and prays that Defendant SSC MISSOURI CITY OPERATING COMPANY, LLC d/b/a FIRST COLONY HEALTH AND REHABILITATION CENTER be cited to appear and answer, and that on final trial, Plaintiff have judgment against Defendant for the following:

    a.    An award of Plaintiff's actual and special personal injury and economic damages within the jurisdictional limits of the Court, including but not limited to the compensatory and consequential damages pleaded herein;

    b.    Costs of Court;

    c.    Pre-judgment and post-judgment interest at the highest rate(s) allowed by law;

    d.      Statutory damages allowed by law, within the jurisdictional limits of the Court;

    e.      Exemplary damages, within the jurisdictional limits of the Court;

    f.      Mental anguish damages; and

    g.      Such other and further relief, at law or in equity, to which Plaintiff may be entitled and which this Court deems just and fair.

Respectfully submitted,

By: */s/ Patrick W. Powers*_____
Patrick W. Powers – Attorney in charge
State Bar No. 24013351
S.D. Tex. Bar No. 24520
patrick@powerstaylor.com
8150 North Central Expressway, Suite 1575
Dallas, Texas 75206
214-239-8900 – Office
214-239-8901 – Fax

**OF COUNSEL:**
Gabriel Canto
State Bar No. 24091638
gabriel@powerstaylor.com

**POWERS TAYLOR LLP**
8150 North Central Expressway, Suite 1575
Dallas, Texas 75206
214-239-8900 – Office
214-239-8901 – Fax

**ATTORNEYS FOR PLAINTIFF**